ANDREW L. PACKARD (State Bar No. 168690)
MICHAEL P. LYNES (State Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

MICHAEL R. LOZEAU (Bar No. 142893)
DOUGLAS J. CHERMAK (Bar No. 233382)
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, California 94501
Tel: (510) 749-9102
Fax: (510) 749-9103
E-mail: mrlozeau@lozeaulaw.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation;<br><br>    Plaintiff,<br><br>  vs.<br><br>TRENCH PLATE RENTAL COMPANY, a corporation;<br><br>    Defendant. | Case No. C 07 4130 CRB<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)<br><br>JURY TRIAL REQUESTED |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

## I.     INTRODUCTION

1.     This complaint seeks relief for Defendant Trench Plate Rental Company's ("Defendant") discharges of polluted storm water and non-storm water pollutants from Defendant's Facility ("the Facility") into the waters of the United States in violation of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq.* (the "Clean Water Act"

COMPLAINT

1    or "the Act") and National Pollutant Discharge Elimination System ("NPDES") Permit No.

2    CAS000001, California Regional Water Quality Control Board, Central Valley Region

3    ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ

4    (hereinafter "the Order" or "Permit"). Defendant's violations of the discharge, treatment

5    technology, and monitoring requirements, and other procedural and substantive requirements

6    of the Permit and the Act are ongoing and continuous.

7         2.      The failure on the part of persons and facilities such as Defendant and its

8    facility to comply with storm water requirements is recognized as a significant cause of the

9    continuing decline in water quality in the San Joaquin River and the Sacramento-San Joaquin

10    Delta (the "Delta"), and other area receiving waters in the Central Valley. The general

11    consensus among regulatory agencies and water quality specialists is that storm water

12    pollution amounts to more than half the total pollution entering the aquatic environment each

13    year. With every rainfall event, millions of gallons of polluted rainwater originating from

14    industries within the surrounding area pour into the San Joaquin River and the Sacramento-

15    San Joaquin Delta. In most urbanized areas, storm water drains completely untreated through

16    storm drain systems directly to the waters of the Delta and other receiving waters.

17         3.      The continuing decline in water quality in the San Joaquin River and the

18    Sacramento-San Joaquin Delta is a matter of serious public concern. Data gathered by

19    CalFed, a coalition of 15 state and federal agencies analyzing water allocation issues, has

20    confirmed that the Delta is a heavily polluted water body. The entire Delta, all of its major

21    tributaries, and the waterways in and around the City of Pittsburg have all been identified by

22    the State Board, the Regional Board, and EPA as impaired water bodies under Section 303(d)

23    of the Clean Water Act. 33 U.S.C. § 1313(d).

24    **II.**    **JURISDICTION AND VENUE**

25         4.      This is a civil suit brought under the citizen suit enforcement provisions of the

26    Clean Water Act. This Court has subject matter jurisdiction over the parties and the subject

27    matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A),

28    and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief

COMPLAINT

1    requested is authorized pursuant to 28 U.S.C. § 2201-02 (power to issue declaratory relief in

2    case of actual controversy and further necessary relief based on such a declaration), 33

3    U.S.C. §§ 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d), 1365(a) (civil

4    penalties).

5        5.    On or about May 16, 2007, Plaintiff provided notice of the Defendant's

6    violations of the Act, and of its intention to file suit against the Defendant, to the

7    Administrator of the United States Environmental Protection Agency ("EPA"), the

8    Administrator of EPA Region IX, the Executive Director of the State Water Resources

9    Control Board ("State Board"), the Executive Officer of the Regional Water Quality Control

10   Board, San Francisco Bay Region ("Regional Board"), the U.S. Attorney General, and to

11   Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of

12   CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

13       6.    More than sixty days have passed since notice was served on Defendant and

14   the state and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that

15   neither the EPA nor the State of California has commenced or is diligently prosecuting a

16   court action to redress the violations alleged in this complaint.  This action is not barred by

17   any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

18       7.    Venue is proper in the Northern District of California pursuant to Section

19   505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

20   within this judicial district.  Pursuant to Local Rule 3-2(c) and (d), intradistrict venue is

21   proper in San Francisco or Oakland, California because the source of the violations is located

22   within Contra Costa County.

23   **III.    PARTIES**

24       8.    Plaintiff California Sportfishing Protection Alliance ("CSPA") is a non-profit

25   public benefit corporation organized under the laws of the State of California with its main

26   office in Stockton, California.  CSPA has approximately 3000 members who live, recreate

27   and work in and around waters of the State of California, including the San Joaquin River,

28   the Delta and other nearby waters of the United States.  CSPA is dedicated to the

COMPLAINT

1   preservation, protection, and defense of the environment, the wildlife and the natural

2   resources of all waters of California.  To further these goals, CSPA actively seeks federal and

3   state agency implementation of the Act and other laws and, where necessary, directly initiates

4   enforcement actions on behalf of itself and its members.

5        9.    Members of CSPA reside in and around Pittsburg, the San Joaquin River

6   and/or the Delta region.  They use and enjoy the San Joaquin River, the Delta, and other local

7   waters for recreation and other activities.  Members of CSPA use and enjoy the waters into

8   which Defendant has caused, are causing, and will continue to cause, pollutants to be

9   discharged.  Members of CSPA use those areas to fish, sail, boat, kayak, swim, birdwatch,

10  view wildlife and engage in scientific study including monitoring activities, among other

11  things.  Defendant's discharges of polluted storm water threaten or impair each of those uses

12  or contribute to such threats and impairments.  Thus, the interests of CSPA's members have

13  been, are being, and will continue to be adversely affected by Defendant's failure to comply

14  with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to

15  Plaintiff caused by Defendant's activities.

16       10.    Continuing commission of the acts and omissions alleged above will irreparably

17  harm Plaintiff and the citizens of the State of California, for which harm they have no plain,

18  speedy or adequate remedy at law.

19       11.    Plaintiff is informed and believes, and thereupon alleges, that Defendant Trench

20  Plate Rental Company is a corporation organized under the laws of the State of California.

21  Defendant operates a heavy equipment rental facility in Pittsburg, California.  According to

22  publicly-available documents, Defendant's activities are designated under Standard Industrial

23  Classification ("SIC") Code 7353 ("Heavy Equipment Rental") and possibly other SIC Codes.

24  **IV.    STATUTORY AND REGULATORY BACKGROUND**

25       12.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

26  pollutant into waters of the United States, unless such discharge is in compliance with

27  various enumerated sections of the Act.  Among other things, Section 301(a) prohibits

28  discharges not authorized by, or in violation of, the terms of an NPDES permit issued

COMPLAINT

1    pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

2        13.    Section 402(p) of the Act establishes a framework for regulating municipal and

3    industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States

4    with approved NPDES permit programs are authorized by Section 402(p) to regulate

5    industrial storm water discharges through individual permits issued to dischargers or through

6    the issuance of a single, statewide general permit applicable to all industrial storm water

7    dischargers.  33 U.S.C. § 1342(p).

8        14.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the

9    U.S. EPA has authorized California's State Board to issue NPDES permits including general

10   NPDES permits in California.

11       15.    The State Board elected to issue a statewide general permit for industrial

12   discharges.  The State Board issued the General Permit on or about November 19, 1991,

13   modified the General Permit on or about September 17, 1992, and reissued the General

14   Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33

15   U.S.C. § 1342(p).

16       16.    In order to discharge storm water lawfully in California, industrial dischargers

17   must comply with the terms of the General Permit or have obtained and complied with an

18   individual NPDES permit.  33 U.S.C. § 1311(a).

19       17.    The General Permit contains several absolute prohibitions.  Discharge

20   Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-

21   storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

22   Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to

23   any surface or ground water that adversely impact human health or the environment.

24   Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that

25   cause or contribute to an exceedance of any applicable water quality standards contained in a

26   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27       18.    In addition to absolute prohibitions, the General Permit contains a variety of

28   substantive and procedural requirements that dischargers must meet.  Facilities discharging,

COMPLAINT

5

1  or having the potential to discharge, storm water associated with industrial activity that have
2  not obtained an individual NPDES permit must apply for coverage under the State's General
3  Permit by filing a Notice of Intent To Comply ("NOI"). The General Permit requires
4  existing dischargers to have filed their NOIs before March 30, 1992.

5      19.    Effluent Limitation B(3) of the General Permit requires dischargers to reduce
6  or prevent pollutants in its storm water discharges through implementation of the Best
7  Available Technology Economically Achievable ("BAT") for toxic and nonconventional
8  pollutants and the Best Conventional Pollutant Control Technology ("BCT") for
9  conventional pollutants. BAT and BCT include both nonstructural and structural measures.
10  General Permit, Section A(8).

11      20.    EPA has established Benchmark Levels as guidelines for determining whether
12  a facility discharging industrial storm water has implemented the requisite BAT and BCT.
13  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). EPA has established Benchmark Levels for the
14  following parameters, among others:  pH – 6.0-9.0; total suspended solids ("TSS") – 100
15  mg/L; oil & grease – 15.0 mg/L; chemical oxygen demand ("COD") – 110 mg/L; biological
16  oxygen demand ("BOD") – 30 mg/L (5-day); iron – 1.0 mg/L; nitrate+nitrite ("N+N") – 0.68
17  mg/L; and total phosphorous – 2.0 mg/L. The State Water Board has proposed the following
18  additional benchmarks: specific conductivity – 200 μmho/cm; total organic carbon ("TOC")
19  – 120 mg/L;

20      21.    Dischargers must develop and implement a Storm Water Pollution Prevention
21  Plan ("SWPPP"). The SWPPP must comply with the BAT and BCT standards. The General
22  Permit requires that an initial SWPPP have been developed and implemented before October
23  1, 1992. The SWPPP must, among other requirements, identify and evaluate sources of
24  pollutants associated with industrial activities that may affect the quality of storm and non-
25  storm water discharges from the facility and identify and implement site-specific best
26  management practices ("BMPs") to reduce or prevent pollutants associated with industrial
27  activities in storm water and authorized non-storm water discharges (Section A(2)). The
28  SWPPP's BMPs must implement BAT and BCT (Section B(3)). The SWPPP must include:

COMPLAINT

1   a description of individuals and their responsibilities for developing and implementing the
2   SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage
3   areas with flow pattern and nearby water bodies, the location of the storm water collection,
4   conveyance and discharge system, structural control measures, impervious areas, areas of
5   actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of
6   significant materials handled and stored at the site (Section A(5)); a description of potential
7   pollutant sources including industrial processes, material handling and storage areas, dust and
8   particulate generating activities, and a description of significant spills and leaks, a list of all
9   non-storm water discharges and their sources, and a description of locations where soil
10  erosion may occur (Section A(6)). The SWPPP must include an assessment of potential
11  pollutant sources at the Facility and a description of the BMPs to be implemented at the
12  Facility that will reduce or prevent pollutants in storm water discharges and authorized non-
13  storm water discharges, including structural BMPs where non-structural BMPs are not
14  effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and
15  must be revised where necessary (Section A(9),(10)).

16      22.    Section C(3) of the General Permit requires a discharger to prepare and submit
17  a report to the Regional Board describing changes it will make to its current BMPs in order
18  to prevent or reduce any pollutant in its storm water discharges that is causing or contributing
19  to an exceedance of water quality standards. Once approved by the Regional Board, the
20  additional BMPs must be incorporated into the Facility's SWPPP. The report must be
21  submitted to the Regional Board no later than 60 days from the date the discharger first
22  learns that its discharge is causing or contributing to an exceedance of an applicable water
23  quality standard. Section C(4)(a). Section C(11)(d) of the General Permit's Standard
24  Provisions also requires dischargers to report any noncompliance. *See also* Section E(6).
25  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water
26  controls including the preparation of an evaluation report and implementation of any
27  additional measures in the SWPPP to respond to the monitoring results and other inspection
28  activities.

COMPLAINT

7

23.    The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992. Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

24.    As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report. Dischargers must also collect and analyze storm water samples from at least two storms per year. Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids ("TSS"), electrical conductance, and total organic carbon ("TOC") or oil and grease, certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility. Section B(5) and Table D of the General Permit requires dischargers whose industrial activities fall within SIC Code 4911 to analyze their storm water discharge samples for iron. Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.

25.    Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board. The annual report must be signed and certified by an appropriate corporate officer. Sections B(14), C(9) and (10). Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying

COMPLAINT

8

1     compliance with the General Permit. *See also* Sections C(9) and (10) and B(14).

2           26.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement

3 actions against any "person," including individuals, corporations, or partnerships, for

4 violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An

5 action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the

6 Act are also subject to an assessment of civil penalties of up to $27,500 per day (violations

7 from January 30, 1997 through March 15, 2004) and $32,500 per day (violations after March

8 15, 2004) pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40

9 C.F.R. §§ 19.1 - 19.4.

10           27.     The Regional Board has established water quality standards for the Sacramento

11 River, and the Sacramento-San Joaquin Delta in the Water Quality Control Plan for the

12 Sacramento River and San Joaquin River Basins, generally referred to as the Basin Plan.

13           28.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll

14 waters shall be maintained free of toxic substances in concentrations that produce detrimental

15 physiological responses in human, plant, animal, or aquatic life."

16           29.     The Basin Plan establishes a standard for electrical conductivity in the Delta of

17 0.7 mmhos/cm from April 1 through August 31 and 1.0 mmhos/cm from September 1

18 through March 31.

19           30.     The Basin Plan provides that "[w]aters shall not contain chemical constituents in

20 concentrations that adversely affect beneficial uses."

21           31.     The Basin Plan provides that "[a]t a minimum, water designated for use as

22 domestic or municipal supply (MUN) shall not contain concentrations of chemical

23 constituents in excess of the maximum contaminant levels (MCLs)." The waters of the San

24 Joaquin River and the Delta have been designated by the State Board for use as municipal

25 and domestic supply.

26 **V.     STATEMENT OF FACTS**

27           32.     Defendant operates a heavy equipment rental facility located at 530 Garcia

28 Avenue in Pittsburg, California. The Facility is classified, at a minimum, under Standard

COMPLAINT

1    Industrial Classification ("SIC") Code 7353 ("Heavy Equipment Rental"). According to
2    publicly available records, Defendant belatedly filed a notice of intent to comply with the
3    terms of the General Permit on or about July 1, 1999 and was assigned Waste Discharge
4    Identification ("WDID") No. 207S015323.

5        33.    The Facility collects and discharges storm water from an approximately 3.25
6    acre industrial site to the City of Pittsburg's storm drains, which discharge into the San
7    Joaquin River and ultimately to the Delta.

8        34.    Industrial activities at the Facility include heavy equipment loading and
9    unloading, storage and maintenance. Defendant's industrial operations occur 24 hours per
10    day on a continuous basis throughout the year.

11        35.    Defendant channels and collects storm water falling on the Facility through one
12    or more discharge points. The Facility discharges storm water to the City of Pittsburg's
13    storm water drainage system, which discharges into the San Joaquin River and eventually to
14    the Delta.

15        36.    CSPA is informed and believes, and thereupon alleges, that pollutants present
16    as a result of Defendant's industrial activities include suspended solids, specific conductivity,
17    copper, iron, lead, manganese, nickel, zinc, nitrate + nitrate ("N+N") and oil & grease.

18        37.    Defendant conducts significant activities at the site in outdoor, uncovered areas
19    that are exposed to rainfall. These activities include the storage, handling, and transport
20    heavy equipment. Heavy machinery and vehicles that operate at the Facility potentially
21    contribute to the presence of other pollutants such as fuels, oils, greases, aluminum, copper,
22    iron, lead and zinc.

23        38.    Plaintiff is informed and believes, and thereupon alleges that storm water flows
24    over the surface of the Facility, collecting sediment, oils, grease, metals, and other pollutants
25    as it flows to the stormwater drain and/or other outlets. Storm water and any pollutants
26    contained in that storm water entering the drains flow directly to the City of Pittsburg storm
27    drain system. CSPA is informed and believes, and thereupon alleges, that the City of
28    Pittsburg does not treat storm water collected in its storm drain system prior to discharging

COMPLAINT

1   storm water and any pollutants contained in such storm water to waters of the United States.

2       39.    The management practices at the Facility continue to be inadequate to prevent

3   the sources of contamination described above from causing the discharge of pollutants to

4   waters of the United States. The Facility lacks sufficient structural controls such as grading,

5   berming, roofing, containment, or drainage structures to prevent rainfall and storm water

6   flows from coming into contact with these and other exposed sources of contaminants. The

7   Facility lacks sufficient structural controls to prevent the discharge of water once

8   contaminated. The Facility lacks adequate storm water pollution treatment technologies to

9   treat storm water once contaminated. The Facility lacks any structural controls to prevent the

10   tracking of pollutants from the Facility and onto adjacent public roadways.

11       40.    Since at least May 16, 2002 Defendant has taken samples of storm water

12   discharges at the Facility and had them analyzed by a laboratory on several occasions. The

13   sample results were reported in the Facility's Annual Reports submitted to the Regional

14   Board for the 2002-2003, 2003-2004, 2004-2005, and 2005-2006 Wet Seasons.

15       41.    Since at least May 16, 2002, Defendant has known that storm water discharges

16   from the Facility contain pollutants in excess of the EPA Benchmark Values and/or the

17   proposed benchmark values for these pollutants. Since at least May 16, 2002, Defendant has

18   also known that storm water discharges from the Facility have a level of specific conductivity

19   in excess of the proposed benchmark value of 200 μmho/cm.

20       42.    On at least six occasions since May 16, 2002, the levels of total suspended

21   solids detected by Defendant in the storm water discharged from its Facility have exceeded

22   the benchmark value of 100 mg/L for TSS established by the EPA (in one instance by a

23   factor of 170). The levels of TSS detected by the Defendant in storm water discharged from

24   the Facility have also exceeded the narrative limits that EPA or the Board have established as

25   water quality standards applicable to TSS in California.

26       43.    On at least five occasions since May 16, 2002, the levels of specific

27   conductivity detected by Defendant in the storm water discharged from the Facility have

28   exceeded the benchmark value of 200 μmho/cm for specific conductivity proposed by the

COMPLAINT

1  State Water Board (in one instance by a factor of 4).

2      44.    The monitoring results described above were reported in Defendant's Annual

3  Reports submitted to the Regional Board.  Defendant is required to include, on Form 5 of

4  those Annual Reports, an evaluation of the adequacy of best management practices at the

5  Facility.  Defendant has failed to include any discussion of any of its exceedances of the

6  EPA's benchmark values or other applicable water quality criteria in any of its Annual

7  Reports submitted in the past five years.

8      45.    On information and belief, Plaintiff alleges that since at least May 16, 2002,

9  Defendant has consistently failed to implement an adequate monitoring plan and have failed

10  to monitor storm water discharged from all of the Facility's discharge points for levels of

11  TSS, specific conductance, TOC, COD, BOD, copper, iron, lead, manganese, nickel, zinc,

12  nitrate + nitrate ("N+N"), oil & grease and other non-monitored pollutants that are likely to

13  be present in storm water discharged from the Facility.

14      46.    On information and believe, Plaintiff alleges that Defendant has not properly

15  analyzed its storm water for the presence of any of these pollutants since May 16, 2002

16  despite the fact that they are likely to be present in significant concentrations in storm water

17  discharged from the Facility.

18      47.    On information and belief, Plaintiff alleges that Defendant has failed to

19  conduct visual observations of every discharge location at the Facility at least once per month

20  during each wet season since the 2001-2002 wet season in violation of Section B(4) of the

21  General Industrial Storm Water Permit.  Where Defendant did conduct visual observations,

22  Defendant failed to adequately describe visible pollutants, even where data indicate large

23  amounts of pollutants being discharged in storm water from the Facility.

24      48.    On information and belief, Plaintiff alleges that since at least May 16, 2002,

25  Defendant has failed to implement BAT and BCT at the Facility for its discharges of these

26  pollutants.  Section B(3) of the General Permit requires that dischargers such as Defendant

27  implement BAT for toxic and nonconventional pollutants and BCT for conventional

28  pollutants by no later than October 1, 1992 or prior to the commencement of operations.  As

COMPLAINT

12

1 | of the date of this Complaint, Defendant has failed to implement BAT and BCT.

2 |        49.     On information and belief, Plaintiff alleges that Defendant has failed to prepare

3 | and regularly update the Facility SWPPP to set forth site-specific best management practices

4 | for the Facility that are adequate to achieve BAT or BCT at the Facility. Plaintiff is informed

5 | and believes, and thereupon alleges, that Defendant's SWPPP is inadequate and fails to

6 | comply with the requirements of the General Permit.

7 |        50.     Information available to Plaintiff indicates that as a result of Defendant's

8 | failure to evaluate the effectiveness of its existing BMPs, its failure to implement BAT and

9 | BCT at the Facility, its failure to fully and properly monitor the quality of storm water

10 | discharges from the Facility and its failure to maintain an adequate SWPPP and monitoring

11 | program for the Facility, storm water containing pollutants harmful to fish, plant and bird

12 | life, and human health is being discharged during every significant rain event from the

13 | Facility directly to the storm water system of the City of Pittsburg, which flows to the San

14 | Joaquin River and the Delta.

15 |        51.     The storm drains and channels operated by the City of Pittsburg are tributary to

16 | the San Joaquin River. The San Joaquin River is a water of the United States and is tributary

17 | to the Delta. The Delta is a water of the United States.

18 |        52.     Plaintiff is informed and believes, and thereupon alleges, that pollutants

19 | discharged by the Facility in its storm water are contributing to violations of water quality

20 | standards that currently apply to the San Joaquin River and the Delta. Plaintiff is informed and

21 | believes, and thereupon alleges, that Defendant are discharging total suspended solids,

22 | specific conductance, TOC, COD, BOD, copper, iron, lead, manganese, nickel, zinc, nitrate

23 | + nitrate ("N+N"), oil & grease and other non-monitored pollutants likely to be present in

24 | storm water discharged from the Facility that are causing or contributing to exceedances of

25 | applicable water quality standards. Defendant is contributing to violations of water quality

26 | standards including, but not limited to, the narrative water quality standard for toxicity and

27 | the numeric water quality standard for specific conductance.

28 |        53.     Plaintiff is informed and believes that Defendant has not submitted any reports

COMPLAINT

1   pursuant to Section C(4)(a) of the General Permit within 60-days of becoming aware of
2   storm water pollutant levels exceeding the EPA benchmark levels or applicable water quality
3   standards. Likewise, Defendant has failed to file a report describing the Facility's
4   noncompliance with the General Permit pursuant to Section C(11)(d) of the General Permit.

5     54. Plaintiff is informed and believes that Defendant failed submit to the Regional
6   Board true and complete annual reports certifying compliance with the General Permit since
7   at least May 16, 2002. Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General
8   Permit, Defendant must submit an annual report, that is signed and certified by the
9   appropriate corporate officer, outlining the Facility's storm water controls and certifying
10  compliance with the General Permit. Plaintiff is informed and believes, and thereupon
11  alleges, that Defendant has signed incomplete annual reports that purported to comply with
12  the General Permit when there was significant noncompliance at the Facility. Information
13  available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in
14  the General Permit for discharges from the Facility due to its continued discharge of
15  contaminated storm water.

16    55. Information available to Plaintiff indicates the continued existence of unlawful
17  storm water and non-storm water discharges at the Facility.

18    56. Information available to CSPA indicates that as a result of these practices,
19  storm water containing excessive pollutants is being discharged during rain events from the
20  Facility directly to storm drains that flow into the San Joaquin River and the Delta.

21    57. Information available to Plaintiff indicates that Defendant has not fulfilled the
22  requirements set forth in the General Permit for discharges from the Facility due to the
23  continued discharge of contaminated storm water. Plaintiff is informed and believes, and
24  thereupon alleges, that all of the violations alleged in this Complaint are ongoing and
25  continuing with every significant rain event.

26  / / /
27  / / /
28  / / /

COMPLAINT

14

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
#### Failure to Develop and Implement the Best Available and Best Conventional Treatment Technologies
##### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

58.   Plaintiff realleges and incorporates Paragraphs 1-57, as if fully set forth herein.

59.   The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, specific conductance, TOC, COD, BOD, copper, iron, lead, manganese, nickel, zinc, nitrate + nitrate ("N+N"), oil & grease and other non-monitored pollutants likely to be present in storm water discharged from the Facility in violation of Effluent Limitation B(3) of the General Permit.

60.   Each day since May 16, 2002 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

61.   Defendant has been in violation of the BAT/BCT requirements every day since at least May 16, 2002. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

### SECOND CAUSE OF ACTION
#### Failure to Prepare, Implement, Review, and Update An Adequate Storm Water Pollution Prevention Plan
##### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

62.   Plaintiff realleges and incorporates Paragraphs 1-61, as if fully set forth herein.

63.   Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

64.   Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the

COMPLAINT

1   Facility is evidenced by, *inter alia*, Defendant's conducting of industrial activities without
2   appropriate best management practices; the continued exposure of significant quantities of raw
3   and waste materials to storm water flows; the continued exposure and tracking of waste
4   resulting from the operation or maintenance of vehicles at the site, including heavy vehicles
5   and machinery, the failure to either treat storm water prior to discharge or to implement
6   effective containment practices; and the continued discharge of pollutants from the Facility at
7   levels in excess of EPA benchmark values and other applicable water quality standards.

8        66.    Defendant has failed to update the Facility's SWPPP in response to the
9   analytical results of the Facility's storm water monitoring.

10       67.    Each day since October 1, 1992 that Defendant has failed to develop, implement
11  and update an adequate SWPPP for the Facility is a separate and distinct violation of Section
12  301(a) of the Act, 33 U.S.C. § 1311(a).

13       68.    Defendant has been in violation of the SWPPP requirements every day since
14  October 1, 1992. Defendant continues to be in violation of the SWPPP requirements each day
15  that it fails to develop and fully implement an adequate SWPPP for the Facility.

16                          **THIRD CAUSE OF ACTION**
17  **Failure to Develop and Implement an Adequate Monitoring and Reporting Program
    (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

18       69.    Plaintiff re-alleges and incorporates Paragraphs 1-68, inclusive, as if fully set
19  forth herein.

20       70.    Section B of the General Permit requires dischargers of storm water associated
21  with industrial activity to develop and implement a monitoring and reporting program
22  (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

23       71.    Defendant has failed to develop and implement an adequate monitoring and
24  reporting program for the Facility. Defendant's ongoing failure to develop and implement an
25  adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to
26  monitor for requisite pollution parameters and to conduct the necessary visual observations
27  each month of each wet season.

28       72.    Each day since October 1, 1992 that Defendant has failed to develop and

COMPLAINT
                                        16

1  implement an adequate monitoring and reporting program for the Facility in violation of the

2  General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

3  1311(a).  The absence of requisite monitoring and analytical results are ongoing and

4  continuous violations of the Act.

5                              **FOURTH CAUSE OF ACTION**
6                         **Discharges of Contaminated Storm Water**
                          **In Violation of Permit Conditions and the Act**
7                          **(Violations of 33 U.S.C. §§ 1311(a), 1342)**

8        73.    Plaintiff re-alleges and incorporates Paragraphs 1-72, inclusive, as if fully set

9  forth herein.

10       74.    Discharge Prohibition A(2) of the General Permit requires that storm water

11  discharges and authorized non-storm water discharges shall not cause or threaten to cause

12  pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the

13  General Permit require that storm water discharges and authorized non-storm water discharges

14  shall not adversely impact human health or the environment, and shall not cause or contribute

15  to a violation of any water quality standards contained in a Statewide Water Quality Control

16  Plan or the applicable Regional Board's Basin Plan.

17       75.    Plaintiff is informed and believes, and thereupon alleges, that since at least May

18  16, 2002, Defendant has been discharging polluted storm water from the Facility directly to

19  storm drains of the City of Pittsburg that flow into the San Joaquin River and ultimately the

20  Delta, in violation of the Discharge Prohibition A(2) of the General Permit.

21       76.    During every rain event, rainwater flows freely over exposed waste and industrial

22  products, production materials, and other accumulated pollutants at the Facility, becoming

23  contaminated with these pollutants. The rainwater then flows untreated from the Facility into

24  one or more adjacent storm water drains.  This contaminated storm water flows through the

25  drains into the San Joaquin River which is tributary to the Delta.

26       77.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

27  contaminated storm water are causing pollution and contamination of the waters of the United

28  States in violation of Discharge Prohibition A(2) of the General Permit.

COMPLAINT

78.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

79.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

80.    Every day since at least May 16, 2002, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### False Certification of Compliance in Annual Report
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

81.    Plaintiff realleges and incorporate Paragraphs 1-80, as if fully set forth herein.

82.    Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least May 16, 2002.

83.    Each day since at least May 16, 2002 that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## V.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.    Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Permit;

COMPLAINT

18

1    c.  Enjoin Defendant from further violating the substantive and procedural

2  requirements of the Permit;

3    d.  Order Defendant to immediately implement storm water pollution control and

4  treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants

5  in the facility's storm water from contributing to violations of any water quality standards in the

6  Delta;

7    e.   Order Defendant to provide Plaintiff with reports documenting the quality

8  and quantity of its discharges to waters of the United States and its efforts to comply with the

9  Act and the Court's orders;

10    f.  Order Defendant to pay civil penalties of $27,500 per day per violation for

11  all violations occurring before March 15, 2004, and $32,500 per day per violation for all

12  violations occurring after March 15, 2004, for each violation of the Act pursuant to Sections

13  309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

14    g.  Order Defendant to take appropriate actions to restore the quality of

15  navigable waters impaired or adversely affected by its activities;

16    h.  Award Plaintiff's costs (including reasonable investigative, attorney, witness,

17  and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

18    i.  Award any such other and further relief as this Court may deem appropriate.

19  Dated: August 10, 2007             Respectfully submitted,

20                      LAW OFFICES OF ANDREW L. PACKARD
21                      LAW OFFICE OF MICHAEL R. LOZEAU

22

23                  By: _____

24                      Andrew L. Packard
                        Attorney for Plaintiff
25                      CALIFORNIA SPORTFISHING PROTECTION
                        ALLIANCE
26

27

28

COMPLAINT

19

**EXHIBIT A**



**California Sportfishing Protection Alliance**
*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

May 16, 2007

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Thomas A. Feldmar
President, CEO, and Agent for Service of Process
Trench Plate Rental Company
13217 Laureldale Avenue
Downey, CA 90242

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act**

Dear Sir:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Trench Plate Rental Company's facility located at 530 Garcia Avenue in Pittsburg, California ("the Facility"). The WDID identification number for the Facility is 2 07S015323. CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife and natural resources of the San Joaquin River, the Sacramento-San Joaquin Delta ("the Delta"), the San Francisco Bay and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of Trench Plate Rental Company (hereafter "Trench Plate Rental" or "you").

This letter addresses Trench Plate Rental's unlawful discharges of pollutants from the Facility to the City of Pittsburg's storm drain system, which discharges into the San Joaquin River and ultimately to the Delta. This letter addresses ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Industrial Storm Water Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File
Suit provides notice of the violations that have occurred, and continue to occur, at the
Facility. Consequently, Trench Plate Rental is hereby placed on formal notice by CSPA
that, after the expiration of sixty (60) days from the date of this Notice of Violation and
Intent to File Suit, CSPA intends to file suit in federal court against Trench Plate Rental
under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the
Clean Water Act and the General Industrial Storm Water Permit. These violations are
described more fully below.

## I.    Background.

On or about July 1, 1999, Trench Plate Rental submitted its notice of intent to
comply with the terms of the General Industrial Storm Water Permit. Based on CSPA's
review of available documents, the Facility has reported to the Regional Board that it is
classified under Standard Industrial Classification Code 7353 ("Heavy Equipment
Rental").[1] The Facility consists of approximately 3.25 acres, approximately 50% of
which are paved or otherwise impervious, and collects and discharges storm water to
Pittsburg's storm drains. Pittsburg's storm drain system empties into the San Joaquin
River and ultimately the Delta.

Outside and without cover, Trench Plate Rental receives, stores, and transports
heavy steel plates, k-rails, aluminum shores and other specially manufactured metal
products. CSPA is informed and believes that potential pollutants from the site include
sediment, suspended solids, metals, and fuels, oils and other fluids associated with the
operation and maintenance of heavy machinery and vehicles.

The San Francisco Bay Regional Water Quality Control Board (the "Regional
Board" or "Board") has identified waters of the San Joaquin and the Delta as failing to
meet water quality standards for unknown toxicity, electrical conductivity, numerous
pesticides and mercury. *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf.
The San Joaquin River is impaired for nickel.

The San Francisco Regional Water Quality Control Board (the "Regional Board"
or "Board") has established water quality standards for the San Francisco Bay, including
the Oakland Estuary and the San Leandro Bay, in the "Water Quality Control Plan for the
San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://
www.swrcb.ca.gov/rwqcb2/basinplan.htm. The Basin Plan includes a narrative toxicity
standard stating that "[a]ll waters shall be maintained free of toxic substances in
concentrations that are lethal to or that produce other detrimental responses in aquatic
organisms." *See* http://www.swrcb.ca.gov/rwqcb2/basinplan/web/BP_CH3.html. The
Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above

---

[1] CSPA is informed and believes that other SIC codes may also apply to activities at the Facility and that
Trench Plate Rental is required to test its storm water for all potential pollutants as required by the General
Industrial Storm Water Permit.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 3 of 10

8.5." *See id.* The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *See id.* The Basin Plan provides that "[w]aters shall not contain biostimulatory substances in concentrations that promote aquatic growths to the extent that such growths cause nuisance or adversely affect beneficial uses." *See id.*

EPA has established secondary MCL, consumer acceptance limits of 0.02 mg/L for aluminum and 1.0 mg/L for iron. *See* http://www.epa.gov/safewater/mcl.html#mcls. The California Department of Health Services has also established MCLs of 0.2-1.0 mg/L for aluminum and 0.3 mg/L for iron. *See* California Code of Regulations, title 22, §§ 64431, 64449. EPA has also established numeric water quality standards for priority toxic pollutants (at a hardness of 100 mg/l), including: 0.009 mg/L for copper, 1.0 mg/L for iron, and 0.1 mg/L for zinc. *See* http://www.epa.gov/waterscience/criteria/wqcriteria. htm.

The General Industrial Storm Water Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Alliance Recycling: aluminum – 0.750 mg/L; copper – 0.0636 mg/L; pH – 6.0-9.0; iron – 1.0 mg/L; lead – 0.0816 mg/L; manganese – 1.0 mg/L; nickel – 1.417 mg/L; nitrate + nitrate ("N+N") = 0.68 mg/L; total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; and zinc – 0.117 mg/L. The State Water Quality Control Board also recently proposed adding a benchmark level for specific conductance of 200 μmho/cm.

## II.    Pollutant Discharges in Violation of the NPDES Permit.

Trench Plate Rental has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Industrial Storm Water Permit. Discharge Prohibition A(1) of the General Industrial Storm Water Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 4 of 10

exceedence of any applicable water quality standards contained in a Statewide Water
Quality Control Plan or the applicable Regional Board's Basin Plan.

### A. Discharges in Violation of the Permit.

Trench Plate Rental has discharged and continues to discharge stormwater with
high levels of total suspended solids ("TSS"), specific conductivity and oil and grease
(measured as n-Hexane Extractable Material ("HEM")) in violation of the General
Industrial Storm Water Permit. These high pollutant levels have been documented during
significant rain events, including rain events indicated in the table of rain data attached
hereto as Exhibit A. Trench Plate Rental's Annual Reports and Sampling and Analysis
Results confirm discharges of specific pollutants and materials other than stormwater in
violation of the General Industrial Storm Water Permit provisions listed above. Self-
monitoring reports under the General Industrial Storm Water Permit are deemed
"conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*,
813 F.2d 1480, 1493 (9th Cir. 1988).

Trench Plate Rental has violated Discharge Prohibitions A(1) and A(2) and
Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit
by discharging storm water with unacceptable levels of TSS, specific conductivity, and
oil and grease on at least the following occasions:

| Date | Parameter | Concentration | EPA Benchmark |
|------|-----------|---------------|---------------|
| 3/20/06 | TSS | 4500 mg/L | 100 mg/L |
| 3/20/06 | Specific Conductivity | 270µmho/cm | 200 µmho/cm |
| 3/20/06 | HEM (Oil & Grease) | 18 mg/L | 15 mg/L |
| 12/22/05 | TSS | 17000 mg/L | 100 mg/L |
| 12/22/05 | Specific Conductivity | 400µmho/cm | 200µmho/cm |
| 12/22/05 | HEM (Oil & Grease) | 17 mg/L | 15 mg/L |
| 11/11/04 | TSS | 1200 mg/L | 100 mg/L |
| 2/15/05 | TSS | 580 mg/L | 100 mg/L |
| 2/15/05 | Specific Conductivity | 320µmho/cm | 200µmho/cm |
| 12/23/03 | TSS | 760 mg/L | 100 mg/L |
| 12/23/03 | Specific Conductivity | 290µmho/cm | 200µmho/cm |
| 4/24/03 | TSS | 280 mg/L | 100 mg/L |
| 4/24/03 | Specific Conductivity | 320µmho/cm | 200µmho/cm |
| 4/24/03 | HEM (Oil & Grease) | 46 mg/L | 15 mg/L |

Trench Plate Rental's Annual Reports confirm that Trench Plate Rental has
known that its stormwater contains the above-listed pollutants at levels exceeding EPA
Benchmarks and other water quality criteria since before May 16, 2002. CSPA alleges
that such violations also have occurred and will occur on other rain dates, including
during every significant rain event that has occurred since at least May 16, 2002, and that
will occur at the Facility subsequent to the date of this Notice of Violation and Intent to
File Suit. Exhibit A, attached hereto, sets forth specific rain dates on which CSPA

alleges that Trench Plate Rental has discharged storm water containing impermissible levels of TSS, specific conductivity, oil and grease and other pollutants in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit.

According to its Annual Reports filed with the Regional Board, Trench Plate Rental described storm water discharged from the Facility as "cloudy" on at least ten occasions since May 16, 2007. Yet, each time pollutants were observed, Trench Plate Rental checked the "No" box on the reporting form where it asks whether pollutants were observed in the storm water discharge. Moreover, despite observing visible pollutants in its storm water discharges, Trench Plate Rental failed to describe the source of the pollutants and to state which BMPs were implemented to prevent or reduce future discharges of the pollutants. Instead, Trench Plate Rental attested that it had fully implemented all necessary BMPs to achieve BAT/BCT at the Facility.

These unlawful discharges from the Facility are ongoing. Each discharge of stormwater containing pollutants at unacceptable levels from the Facility constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Trench Plate Rental is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since May 16, 2002.

**B.    Failure to Develop and Implement an Adequate Storm Water Monitoring Plan**

Section B(5)(a) of the General Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." (emphasis added) Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) requires that "samples shall be analyzed for . . . [t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

Trench Plate Rental has failed to analyze its storm water samples for all chemicals and pollutants that are "likely to be present in storm water discharges in significant quantities." See Section B(5)(c)(ii). CSPA is informed and believes that at least the following additional pollutants are "likely" to be present in Trench Plate Rental's storm water discharges in significant quantities: aluminum, copper, iron, lead, manganese, nickel and zinc. Trench Plate Rental's ongoing failure to analyze its storm water samples for these and other pollutants likely to be present in its storm water discharges constitutes ongoing violations of the Act.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 6 of 10

Section B(4) of the General Permit requires all dischargers to visually observe storm water discharges from their facilities at least once per month during the wet season (October 1 – May 160). Visual observations must document the presence of any "floating and suspended material, oil and grease, discolorations, turbidity, odor, and source of any pollutants." Records of observations must be maintained and the discharger must respond to reduce or prevent future discharges of pollutants. The discharger's SWPPP must also be modified accordingly.

Each of Trench Plate Rental's failures to comply with these mandatory monitoring requirements constitutes an ongoing violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Trench Plate Rental is subject to penalties for these violations of the General Industrial Storm Water Permit and the Act since May 16, 2002.

**C.    *Failure to Implement BAT and BCT*.**

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and non-conventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Industrial Storm Water Permit, Section A(8). CSPA's investigation indicates that Trench Plate Rental has not implemented BAT and BCT at the Facility for its discharges of total suspended solids, pH, specific conductivity, and other pollutants in violation of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

Trench Plate Rental was required to have implemented BAT and BCT by no later than October 1, 1992. Trench Plate Rental has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that Trench Plate Rental fails to implement BAT and BCT. Trench Plate Rental is subject to penalties for violations of the Order and the Act occurring since May 16, 2002.

**D.    *Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan***

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP by no later than October 1, 1992 and to continuously update the SWPPP and its implementation to reflect BAT and BCT storm water controls. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 7 of 10

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Industrial Storm Water Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Industrial Storm Water Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby waterbodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Industrial Storm Water Permit, Section A(4)); a list of significant materials handled and stored at the site (General Industrial Storm Water Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Industrial Storm Water Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Industrial Storm Water Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Industrial Storm Water Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedence of water quality standards.

CSPA's investigation of the conditions at the Facility demonstrates that Trench Plate Rental has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Trench Plate Rental has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Trench Plate Rental has been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that Trench Plate Rental fails to develop and implement an effective SWPPP. Trench Plate Rental is subject to penalties for violations of the Order and the Act occurring since May 16, 2002.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 8 of 10

### E.   Failure to Address Discharges Contributing to Exceedances of Water Quality Standards.

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Trench Plate Rental discharges storm water containing unacceptable levels of total suspended solids, specific conductivity and oil and grease that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutants, Trench Plate Rental was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Trench Plate Rental was aware of high levels of many these pollutants prior to May 16, 2002. Yet, Trench Plate Rental has never filed a timely report describing its non-compliance with the General Industrial Storm Water Permit in violation of Section C(11)(d).

Trench Plate Rental has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since at least May 16, 2002, and will continue to be in violation every day that Trench Plate Rental fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Trench Plate Rental is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since May 16, 2002.

### F.   Failure to File Timely, True and Correct Annual Reports.

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Industrial Storm Water Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 9 of 10

discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Industrial Storm Water Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Trench Plate Rental has signed and submitted incomplete Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance at the Facility. Trench Plate has consistently submitted its Annual Reports late (approximately August 11th in 2006, August 18 in 2005, and August 4th in 2004). In 2003, Trench Plate Rental submitted its 2002-2003 Annual Report on May 19, 2003 despite that the Wet Season does not end until May 161st; moreover, Trench Plate Rental failed to conduct a visual observation of storm water discharge during May 2003, claiming that there was "no rain."

Consequently, Trench Plate Rental has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Trench Plate Rental submitted an incomplete or incorrect annual report that falsely certified compliance with the Act. These violations are continuous and ongoing until Trench Plate Rental submits a complete and correct Annual Report for each year that Trench Plate Rental has been subject to the General Permit. Trench Plate Rental is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since May 16, 2002.

## III.    Persons Responsible for the Violations.

CSPA puts Trench Plate Rental Company on notice that it is the person responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Trench Plate Rental on notice that it intends to include those persons in this action.

## IV.    Name and Address of Noticing Party.

Our name, address and telephone number is as follows: Bill Jennings, Executive Director, California Sportfishing Protection Alliance, 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

## V.    Counsel.

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

Andrew L. Packard
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
(707) 763-7227
andrew@packardlawoffices.com

Michael R. Lozeau
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, California 94501
(510) 749-9102
mrlozeau@lozeaulaw.com

## VI.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Trench Plate Rental to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, CSPA will seek declaratory relief and injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Trench Plate Rental and its agents for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Tom Howard, Acting Executive Director
State Water Resources Control Board
1001 "I" Street
Sacramento, CA 95814

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

# ATTACHMENT A

Significant Rain Events*, Trench Plate Rental (Pittsburg, CA)
May 16, 2002 – May 16, 2007

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| November | 07 | 2002 | February | 24 | 2004 | November | 28 | 2005 |
| December | 09 | 2002 | February | 25 | 2004 | November | 30 | 2005 |
| December | 14 | 2002 | February | 26 | 2004 | December | 17 | 2005 |
| December | 16 | 2002 | March | 01 | 2004 | December | 18 | 2005 |
| December | 20 | 2002 | May | 28 | 2004 | December | 20 | 2005 |
| December | 21 | 2002 | October | 19 | 2004 | December | 21 | 2005 |
| December | 27 | 2002 | October | 23 | 2004 | December | 22 | 2005 |
| December | 30 | 2002 | October | 24 | 2004 | December | 25 | 2005 |
| January | 09 | 2003 | November | 03 | 2004 | December | 27 | 2005 |
| January | 10 | 2003 | November | 09 | 2004 | December | 28 | 2005 |
| January | 21 | 2003 | November | 10 | 2004 | December | 30 | 2005 |
| March | 14 | 2003 | November | 11 | 2004 | December | 31 | 2005 |
| March | 16 | 2003 | December | 06 | 2004 | January | 01 | 2006 |
| March | 22 | 2003 | December | 07 | 2004 | January | 02 | 2006 |
| April | 03 | 2003 | December | 08 | 2004 | January | 18 | 2006 |
| April | 12 | 2003 | December | 27 | 2004 | January | 30 | 2006 |
| May | 02 | 2003 | December | 28 | 2004 | February | 17 | 2006 |
| May | 03 | 2003 | December | 29 | 2004 | February | 26 | 2006 |
| August | 21 | 2003 | December | 30 | 2004 | February | 27 | 2006 |
| November | 06 | 2003 | December | 31 | 2004 | March | 02 | 2006 |
| November | 08 | 2003 | January | 01 | 2005 | March | 03 | 2006 |
| November | 15 | 2003 | January | 02 | 2005 | March | 06 | 2006 |
| November | 30 | 2003 | January | 06 | 2005 | March | 11 | 2006 |
| December | 01 | 2003 | January | 07 | 2005 | March | 13 | 2006 |
| December | 04 | 2003 | January | 08 | 2005 | March | 17 | 2006 |
| December | 06 | 2003 | January | 10 | 2005 | March | 18 | 2006 |
| December | 09 | 2003 | January | 11 | 2005 | March | 21 | 2006 |
| December | 10 | 2003 | January | 25 | 2005 | March | 25 | 2006 |
| December | 13 | 2003 | January | 27 | 2005 | March | 28 | 2006 |
| December | 19 | 2003 | February | 14 | 2005 | March | 29 | 2006 |
| December | 22 | 2003 | February | 15 | 2005 | April | 03 | 2006 |
| December | 23 | 2003 | February | 17 | 2005 | April | 04 | 2006 |
| December | 24 | 2003 | February | 19 | 2005 | April | 05 | 2006 |
| December | 26 | 2003 | February | 20 | 2005 | April | 11 | 2006 |
| December | 28 | 2003 | February | 26 | 2005 | April | 12 | 2006 |
| December | 29 | 2003 | February | 27 | 2005 | April | 13 | 2006 |
| January | 01 | 2004 | March | 01 | 2005 | April | 17 | 2006 |
| January | 02 | 2004 | March | 03 | 2005 | May | 21 | 2006 |
| January | 06 | 2004 | March | 18 | 2005 | November | 01 | 2006 |
| January | 23 | 2004 | March | 19 | 2005 | November | 03 | 2006 |
| February | 02 | 2004 | March | 21 | 2005 | November | 10 | 2006 |
| February | 03 | 2004 | March | 22 | 2005 | December | 14 | 2006 |
| February | 15 | 2004 | March | 27 | 2005 | December | 21 | 2006 |
| February | 16 | 2004 | April | 08 | 2005 | January | 28 | 2007 |
| February | 17 | 2004 | April | 27 | 2005 | February | 08 | 2007 |
| February | 18 | 2004 | May | 07 | 2005 | February | 09 | 2007 |
| February | 21 | 2004 | May | 08 | 2005 | February | 10 | 2007 |

*Rain data gathered from three independent weather monitoring stations near the Facility. Precipitation given in inches.

## ATTACHMENT A

Significant Rain Events*, Trench Plate Rental (Pittsburg, CA)
May 16, 2002 – May 16, 2007

| February | 12 | 2007 | February | 26 | 2007 | April | 21 | 2007 |
|----------|----|------|----------|----|------|-------|----|------|
| February | 22 | 2007 | February | 27 | 2007 | April | 22 | 2007 |
| February | 25 | 2007 | April | 14 | 2007 | | | |

*Rain data gathered from three independent weather monitoring stations near the Facility.  Precipitation given in inches.