ANDREW L. PACKARD (Bar No. 168690)
MICHAEL P. LYNES (Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA  94952
Tel:  (707) 763-7227
Fax:  (707) 763-9229
Email:  andrew@packardlawoffices.com

MICHAEL R. LOZEAU (CA Bar No. 142893)
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel:  (510) 749-9102
Fax: (510) 749-9103
Email:  mrlozeau@lozeaulaw.com


Attorneys for Plaintiff CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation;<br><br>Plaintiff,<br><br>vs.<br><br>TRENCH PLATE RENTAL COMPANY, a corporation;<br><br>Defendant. | Case No.  C-07-4130-CRB<br><br>**STIPULATION FOR DISMISSAL**<br><br>**[PROPOSED] ORDER TO DISMISS**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)<br><br>Complaint Filed: August 10, 2007<br>Hon. Charles R. Breyer |

1    WHEREAS, on May 16, 2007, Plaintiff California Sportfishing Protection

2  Alliance ("CSPA") provided Defendant Trench Plate Rental Company with a Notice

3  of Violations and Intent to File Suit ("Notice") under Clean Water Act §505, 33

4  U.S.C. §1365.

5    WHEREAS, on August 10, 2007 CSPA filed its Complaint against Trench

6  Plate Rental Company in this court, *California Sportfishing Protection Alliance v.*

7  *Trench Plate Rental Co.* Case No. C-07-4130-CRB.  Said Complaint incorporates by

8  reference all of the allegations contained in CSPA's Notice.

9    WHEREAS, CSPA and Trench Plate Rental, through their authorized

10  representatives and without either adjudication of CSPA's claims or admission by

11  Trench Plate Rental of any alleged violation or other wrongdoing, have chosen to

12  resolve in full by way of settlement the allegations of CSPA as set forth in the Notice

13  and Complaint, thereby avoiding the costs and uncertainties of further litigation.  A

14  copy of the [Proposed] Consent Agreement entered into by and between CSPA and

15  Trench Plate Rental is attached hereto as Exhibit A and incorporated by reference.

16    WHEREAS, the parties submitted the Settlement Agreement via certified mail,

17  return receipt requested, to the U.S. EPA and the U.S. Department of Justice and the

18  45-day review period set forth at 40 C.F.R. § 135.5 has completed.  On February 13,

19  2008, the U.S. Department of Justice filed its letter expressing no objection to the

20  proposed agreement with this Court.

21    NOW THEREFORE, IT IS HEREBY STIPULATED and agreed to by and

22  between the parties that CSPA's claims, as set forth in the Notice and Complaint, be

23  dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The

24  parties respectfully request an order from this Court dismissing such claims with

25  prejudice.  In accordance with paragraphs 16 and 17 of the Consent Agreement, the

26  parties also request that this Court retain and have jurisdiction over the Parties with

27  respect to disputes arising under the agreement.

28

Date:  February 13, 2008          LAW OFFICES OF ANDREW L. PACKARD

                                  /s/ Michael P. Lynes
                                  Michael P. Lynes
                                  Attorneys for Plaintiff
                                  CALIFORNIA SPORTFISHING
                                  PROTECTION ALLIANCE


Date: February 13, 2008           DONGELL LAWRENCE FINNEY LLP

                                  /s/ Jason M. Booth
                                  Jason M. Booth
                                  Attorneys for Defendant
                                  TRENCH PLATE RENTAL COMPANY
                                  [Electronically signed with counsel's authorization]


### [~~PROPOSED~~] ORDER

Good cause appearing, and the parties having stipulated and agreed,

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's claims against Trench Plate Rental Company as set forth in the Notice and Complaint filed in Case No. C-07-4130-CRB, are hereby dismissed with prejudice.

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under the agreement attached to the parties' Stipulation to Dismiss as Exhibit A.

IT IS SO ORDERED.


Dated:  Feb. 15, 2008  _____
                        Hon. Charles R. Breyer, United States District
                        Court

*UNITED STATES DISTRICT COURT*
*IT IS SO ORDERED*
*Judge Charles R. Breyer*
*NORTHERN DISTRICT OF CALIFORNIA*

# EXHIBIT A

ANDREW L. PACKARD (Cal. Bar No. 168690)
MICHAEL P. LYNES (Cal. Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel. (707) 763-7227
Fax. (707) 763-9227
Email: andrew@packardlawoffices.com

MICHAEL R. LOZEAU (Cal. Bar No. 143892)
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103
E-mail: mrlozeau@lozeaulaw.com

Attorneys for Plaintiff California Sportfishing Protection Alliance

JASON BOOTH (Cal Bar No. 143437)
Dongell Lawrence Finney LLP
707 Wilshire Blvd., 45 Floor
Los Angeles, CA 9001
Tel: (213) 943-6100
Fax: (213) 943-6101
Email: jbooth@dfllawyers.com

Attorneys for Defendant Trench Plate Rental Company

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation; <br><br> Plaintiff, <br><br> vs. <br><br> TRENCH PLATE RENTAL COMPANY, a corporation; <br><br> Defendant. | Case No. C-07-4130-CRB <br><br> [PROPOSED] CONSENT AGREEMENT |

## CONSENT AGREEMENT

This CONSENT AGREEMENT ("AGREEMENT") is entered into between the California Sportfishing Protection Alliance ("CSPA") and Trench Plate Rental Company ("TPR") (collectively, the "CONSENTING PARTIES") with respect to the following facts and objectives:

## RECITALS

WHEREAS, CSPA is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the rivers, creeks, and tributaries of the San Joaquin River and Sacramento-San Joaquin Delta and the San Francisco Bay. Bill Jennings is the Chairperson of CSPA and a member of CSPA;

WHEREAS, TPR is a corporation organized under the laws of the State of California that owns and operates a heavy equipment rental facility at 530 Garcia Ave., Pittsburg, California (the "Facility") pursuant to State Water Resources Control Board Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities (hereinafter, the "General Permit"). A map of the Facility is attached hereto as Exhibit A and incorporated by reference;

WHEREAS, on May 16, 2007, CSPA provided TPR a Notice of Violation and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365, a true and correct copy of which is attached hereto as Exhibit B and incorporated by reference;

WHEREAS, on August 10, 2007, CSPA filed its Complaint in the United States District Court for the Northern District of California against the TPR (*California Sportfishing Protection Alliance v. Trench Plate Rental Co.* Case No. C074130);

WHEREAS, TPR denies any and all of CSPA's claims in its 60-Day Notice Letter and Complaint;

WHEREAS, CSPA and TPR, through their authorized representatives and without either adjudication of CSPA's claims or admission by TPR of any alleged violation or other wrongdoing, have chosen to resolve in full CSPA's allegations in the 60-Day Notice Letter and Complaint through settlement and avoid the cost and uncertainties of further litigation; and

WHEREAS, CSPA and TPR have agreed that it is in their mutual interest to enter into this AGREEMENT setting forth the terms and conditions appropriate to resolving CSPA's allegations set forth in the 60-Day Notice Letter and Complaint.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, CSPA and TPR hereby agree as follows:

## EFFECTIVE DATE

1.     The term "Effective Date," as used in this AGREEMENT, shall mean the last date on which the signature of a party to this AGREEMENT is executed.

## COMMITMENTS OF CSPA

2.     Stipulation to Dismiss and [Proposed] Order.  Within ten (10) calendar days of the expiration of the Agencies' review period specified in Paragraph 10 below, CSPA shall file a Stipulation to Dismiss and [Proposed] Order thereon pursuant to Federal Rule of Civil Procedure 41(a)(2) with the United States District Court for the Northern District of

California ("District Court"), with this AGREEMENT attached and incorporated by reference, specifying that CSPA is dismissing all claims in CSPA's Complaint. Consistent with Paragraphs 24 and 25 herein, the Stipulation to Dismiss and [Proposed] Order shall state that the District Court will maintain jurisdiction through September 1, 2009, for purposes of resolving any disputes between the CONSENTING PARTIES with respect to any provision of this AGREEMENT. If the District Court chooses not to enter the Order, this AGREEMENT shall be null and void.

## COMMITMENTS OF TRENCH PLATE RENTAL

3.      Compliance with General Permit. TPR agrees to operate the Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.

4.      MITIGATION PAYMENT. In recognition of the good-faith efforts by TPR to comply with all aspects of the General Permit and the Clean Water Act, and in lieu of payment by TPR of any penalties, which may have been assessed in this action if it had proceeded to trial, TPR agrees to pay the sum of twenty thousand dollars ($20,000.00) to the Rose Foundation for Communities and the Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally beneficial projects within the San Joaquin River and Sacramento River basins, the Sacramento-San Joaquin Delta ("Delta"), and the San Francisco Bay, relating to water quality improvements in those areas, provided that the Rose Foundation agrees that it will not use or grant any funds provided by TPR to engage in political lobbying activity. TPR shall make payment of twenty thousand dollars ($20,000) to the Rose Foundation for Communities and the Environment not later than 30-days from the entry of the order dismissing CSPA's Complaint.

5.      **Implemented Storm Water Controls.**  TPR shall maintain in good working order all storm water collection and treatment systems installed as of the Effective Date, including but not limited to, existing housekeeping measures.  Since the service of the 60-Day Notice, TPR has implemented the following additional stormwater management and housekeeping measures:

     a.      Installed an absorbent "sock" within the storm drain located at Outfall No. 1 (See Site Map, attached hereto as Exhibit A);

     b.      Installed straw bales and straw waddles around storm drain/Outfall No. 1 (to allow for water detention and settlement, and thereby reduce discharge of suspended solids);

     c.      Installed rock plates at the main driveway entrance (i.e. the western driveway used by the company trucks and heavy equipment) to reduce the tracking of materials onto or off of the Facility;

     d.      Installed rock plates at the separation between asphalt and unpaved portions of yard;

     e.      Closed the storm drain outfall located in welding area (Outfall No. 2);

     f.      Captured and disposed of water falling into the welding area which surrounds Outfall No. 2 (see site map);

     g.      Installed a cover over the scrap metal storage area;

     h.      Performed extensive clean up and removal of debris, scrap metal, and sediment from around materials storage areas, including regular use of street sweeper over the entire paved area;

     i.      Removed all slide rail product from northwest wall (and performed thorough cleaning and sweeping of area);

     j.      Reconfigured materials storage areas to reduce possible discharge of suspended solids or metals in storm water; and

     k.      Installed straw bales and waddles at Outfall No. 3 (southeast corner of Facility) to prevent or reduce discharge of suspended solids from Outfall No. 3.

These additional BMPs have been or will be incorporated into TPR's Storm Water Pollution Prevention Plan ("SWPPP").

6.      **Additional Protections**.  TPR shall take the following actions to improve the storm water pollution prevention measures at the Facility:

a. TPR agrees to install, not later than February 1, 2008, additional straw bales and waddles around Outfall No. 1. TPR shall replace individual straw bales and/or waddles as needed to assure their continued effectiveness in preventing suspended materials from reaching the storm drains.

b. TPR agrees to regularly replace the absorbent sock located inside the storm drain entrance at Outfall No. 1.

c. TPR agrees to regularly remove accumulated sediment from the asphalt covered portions of the Facility and redistribute them on the unpaved portions of the Facility, including removal of accumulated sediment following all significant rain events which lead to discharge from Outfall No. 1 or potential discharge for Outfall No. 1.

d. TPR agrees to sweep all paved areas using a mechanical sweeper in the Facility at least 4 times per month

e. TPR agrees to keep the drain located inside the welding area (Outfall No. 2) blocked and capture all storm water entering the welding area. TPR will arrange for capture and appropriate disposal of all storm water entering the welding area (see attached site map) and prevent intermingling of storm water with water captured in the welding area

These additional BMPs shall be incorporated into the SWPPP, and the Site Map will be updated, by February 1, 2008.

7. **Monitoring.** TPR agrees to perform the monitoring described herein during the 2007-2008 and 2008-2009 rainy seasons:

a. TPR shall sample its 3 outfalls during two (2) storm events that result in discharge consistent with the requirements and protocols set forth in the General Permit. If, however, the first sampling event of the season shows a level of any pollutant in storm water from an outfall in exceedence of EPA's parameter benchmark values (see 65 Fed.Reg. 64767, Table 3 (Oct. 2000)), TPR agrees to take a follow-up sample of storm water from that outfall on the first qualifying storm event thereafter that such outfall discharges storm water. Such follow-up sample shall be in addition to the second storm water sample required by the General Permit.

b.    Storm water samples shall be sent to a qualified laboratory accredited by the State of California and analyzed for pH, total suspended solids, specific conductivity, and oil and grease, as required by the General Permit.

c.    In addition, TPR agrees to collect and analyze samples collected after the Effective Date during the 2007-2008 and 2008-2009 wet seasons for copper, iron, manganese, and zinc ("Additional Parameters"). If the average level of a particular Additional Parameter in two storm water samples taken from the same discharge point at the Facility for two consecutive storm events does not exceed the applicable EPA Benchmark Value TPR may cease testing for the particular Additional Parameter pursuant to this Agreement. However, this Agreement does not otherwise affect TPR's monitoring obligations under the General Permit or applicable law.

d.    TPR further agrees to provide CSPA with copies of all analytical reports of storm water samples collected during the term of this Agreement within seven (7) days of receiving such reports from the analytical laboratory.

e.    For each significant rain event occurring during the 2007-2008 or 2008-2009 wet seasons during regularly scheduled operating hours, TPR shall conduct visual observations of the perimeter fence and maintain a log describing any discharges from the Facility.

8.    **Meet and Confer Regarding Exceedence of Levels of Potential Concern.** If analytical results of storm water samples taken by TPR during the 2007-2008 or the 2008-2009 rainy seasons indicate that storm water discharges from the Facility exceed the EPA Benchmark Values as set forth in Table 3 of 65 Fed.Reg. 64767 (2000), TPR agrees to take additional feasible measures aimed at reducing pollutants in the Facility's storm water to levels at or below the Benchmark levels.

a.     **Action Plan.**  While preparing its Annual Report to be submitted to the Regional Board as required by Section B.14 of the General Industrial Storm Water Permit, TPR agrees to review all monitoring data related to storm water (including storm water samples and visual observations of discharges) gathered at the site during the previous Wet Season and any correspondence from CSPA regarding the results of storm water sampling analysis.  Based on the available data and comments, TPR will consider revised or additional BMPs necessary to achieve BAT/BCT at the Facility and draft an Action Plan to implement any revised or additional BMPs deemed by TPR to be necessary.  The Action Plan will describe revised or additional BMPs and provide an estimated timeline for the revision or implementation of these BMPs.  TPR will provide a copy of the Action Plan to CSPA.  CSPA may review and comment on the Action Plan and suggest recommended BMPs that it believes are appropriate.  Upon request by CSPA, TPR agrees to meet and confer in good faith regarding the contents of the Action Plan and CSPA's recommendations.

9.     **Fees, Costs, and Expenses.**  As reimbursement for CSPA's investigative, expert and attorneys' fees and costs, TPR shall pay CSPA the sum of fifteen thousand dollars ($15,000.00).  TPR will also pay three thousand dollars ($3,000) to cover the cost of future meet and confer efforts regarding ongoing compliance at the Facility, including the review of storm water sampling results, annual reports, and any Action Plans generated

pursuant to Paragrah 8(a).  Payment of attorneys' fees and monitoring costs shall be made by TPR within fifteen (15) calendar days of the District Court's entry of the Order dismissing the action described in Paragraph 2 of this AGREEMENT.  Payment by TPR to CSPA shall be made in the form of a single check payable to "Law Offices of Andrew Packard, Attorney Client Trust Account," and shall constitute full payment for all costs of litigation, including investigative, expert and attorneys' fees and costs incurred by CSPA that have or could have been claimed in connection with CSPA's claims, up to and including, the Effective Date of this AGREEMENT.

10.    **Review by Federal Agencies.**  TPR shall submit this AGREEMENT to the U.S. EPA and the U.S. Department of Justice (hereinafter, the "Agencies") via certified mail, return receipt requested, within five (5) days after the Effective Date of this AGREEMENT for review consistent with 40 C.F.R. § 135.5.  The Agencies' review period expires forty-five (45) days after receipt of the AGREEMENT by both Agencies, as evidenced by the return receipts, copies of which shall be provided to CSPA upon receipt by TPR.  In the event that the Agencies comment negatively on the provisions of this AGREEMENT, CSPA and TPR agree to meet and confer to attempt to resolve the issue(s) raised by the Agencies.  If CSPA and TPR are unable to resolve any issue(s) raised by the Agencies in their comments, CSPA and TPR agree to expeditiously seek a settlement conference with the Magistrate Judge assigned to the Complaint in this matter to resolve the issue(s).

## <u>NO ADMISSION OR FINDING</u>

11.    Neither this AGREEMENT nor any payment pursuant to the AGREEMENT shall constitute evidence or be construed as a finding, adjudication, or acknowledgment of

any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule or regulation.  However, this AGREEMENT and/or any payment pursuant to the AGREEMENT may constitute evidence in actions seeking compliance with this AGREEMENT.

### MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

12.    In consideration of the above, and except as otherwise provided by this AGREEMENT, the CONSENTING PARTIES hereby forever and fully release each other and their respective successors, assigns, officers, agents, employees, and all persons, firms and corporations having an interest in them, from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the CONSENTING PARTIES have against each other arising from CSPA's allegations and claims as set forth in the 60-Day Notice Letter and Complaint, up to and including, the Termination Date of this AGREEMENT.

13.    The CONSENTING PARTIES acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The CONSENTING PARTIES hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the 60-Day Notice Letter and Complaint, up to and including, the Termination Date of this AGREEMENT.

14.    For the period beginning on the Effective Date and ending on September 1, 2009, CSPA agrees that neither CSPA, its officers, executive staff, members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against TPR seeking relief for alleged violations of the Clean Water Act or violations of the General Permit.  CSPA further agrees that, beginning on the Effective Date and ending on September 1, 2009, CSPA will not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against TPR that may be proposed by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge TPR's compliance with the Clean Water Act or the General Permit.

## TERMINATION DATE OF AGREEMENT

15.    This AGREEMENT shall terminate on September 1, 2009.

## DISPUTE RESOLUTION PROCEDURES

16.    Except as specifically noted herein, any disputes with respect to any of the provisions of this AGREEMENT shall be resolved through the following procedure.  The CONSENTING PARTIES agree to first meet and confer to resolve any dispute arising under this AGREEMENT.  In the event that such disputes cannot be resolved through this meet and confer process, the CONSENTING PARTIES agree to request a settlement meeting before the Magistrate Judge assigned to this action.  In the event that the CONSENTING PARTIES cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the CONSENTING PARTIES agree to submit the dispute via motion to the Magistrate Judge.

17.     In resolving any dispute arising from this AGREEMENT, the Magistrate Judge shall have discretion to award attorneys' fees and costs to either party.  The relevant provisions of the then-applicable Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any disputes before the Magistrate Judge.  The Magistrate Judge shall award relief limited to compliance orders and awards of attorneys' fees and costs, subject to proof.  The CONSENTING PARTIES agree to file any waivers necessary for the Magistrate Judge to preside over any settlement conference and motion practice.

## BREACH OF SETTLEMENT AGREEMENT

18.     **Impossibility of Performance.**  Where implementation of the actions set forth in this AGREEMENT, within the deadlines set forth in those paragraphs, becomes impossible, despite the timely good faith efforts of the CONSENTING PARTIES, the party who is unable to comply shall notify the other in writing within seven (7) days of the date that the failure becomes apparent, and shall describe the reason for the non-performance. The CONSENTING PARTIES agree to meet and confer in good faith concerning the non-performance and, where the CONSENTING PARTIES concur that the non-performance was or is impossible, despite the timely good faith efforts of one of the COSENTING PARTIES, new performance deadlines shall be established.  In the event that the CONSENTING PARTIES cannot timely agree upon the terms of such a stipulation, either of the CONSENTING PARTIES shall have the right to invoke the dispute resolution procedure described herein.

## <u>GENERAL PROVISIONS</u>

19.    **Construction.**  The language in all parts of this AGREEMENT shall be construed according to its plain and ordinary meaning, except as to those terms defined by law, in the General Permit, Clean Water Act or specifically herein.

20.    **Choice of Law.**  This AGREEMENT shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

21.    **Severability.**  In the event that any provision, section, or sentence of this AGREEMENT is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

22.    **Correspondence.**  All notices required herein or any other correspondence pertaining to this AGREEMENT shall be sent by regular, certified, or overnight mail as follows:

<u>If to CSPA:</u>
Bill Jennings, Chairman
California Sportfishing Protection Alliance
3536 Rainier Road
Stockton, CA  95204
Tel: (209) 464-5067
deltakeep@aol.com

And to:

Andrew L. Packard
Michael Lynes
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA  94952
Tel: (707) 763-7227
andrew@packardlawoffices.com

<u>If to TPR</u>:

Al Huggans
Jodie White
Trench Plate Rental Co.
530 Garcia Avenue
Pittsburg, PA  94565-4901
Tel: (925) 432-9120

And to:

Jason M. Booth
Dongell Lawrence Finney LLP
707 Wilshire Boulevard, 45th Floor
Los Angeles, CA  90017
Tel:  (213) 943-6100
jbooth@dlflawyers.com

Notifications of communications shall be deemed submitted on the date that they are e-mailed, postmarked and sent by first-class mail or deposited with an overnight mail/delivery service.  Any change of address or addresses shall be communicated in the manner described above for giving notices.

23.    **Counterparts.**  This AGREEMENT may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopied, scanned (pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed counterparts of this AGREEMENT.

24.    **Assignment.**  Subject only to the express restrictions contained in this AGREEMENT, all of the rights, duties and obligations contained in this AGREEMENT shall inure to the benefit of and be binding upon the CONSENTING PARTIES, and their successors and assigns.

25. **Modification of the Agreement.** This AGREEMENT, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the CONSENTING PARTIES.

26. **Full Settlement.** This AGREEMENT constitutes a full and final settlement of this matter. It is expressly understood and agreed that the AGREEMENT has been freely and voluntarily entered into by the CONSENTING PARTIES with and upon advice of counsel.

27. **Integration Clause.** This is an integrated AGREEMENT. This AGREEMENT is intended to be a full and complete statement of the terms of the agreement between the CONSENTING PARTIES and expressly supersedes any and all prior oral or written agreements covenants, representations and warranties (express or implied) concerning the subject matter of this AGREEMENT.

28. **Authority.** The undersigned representatives for CSPA and TPR each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this AGREEMENT.

The CONSENTING PARTIES hereby enter into this AGREEMENT.

Date: _12-20-_ , 2007

TRENCH PLATE RENTAL COMPANY

By: Al Huggans
Title: Vice President

Date:_____, 2007

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

By: Bill Jennings
Title: Executive Director

| [PROPOSED] Consent Agreement | 14 | CASE NO. C-07-4130-CRB |
| --- | --- | --- |

25.    **Modification of the Agreement.** This AGREEMENT, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the CONSENTING PARTIES.

26.    **Full Settlement.** This AGREEMENT constitutes a full and final settlement of this matter. It is expressly understood and agreed that the AGREEMENT has been freely and voluntarily entered into by the CONSENTING PARTIES with and upon advice of counsel.

27.    **Integration Clause.** This is an integrated AGREEMENT. This AGREEMENT is intended to be a full and complete statement of the terms of the agreement between the CONSENTING PARTIES and expressly supersedes any and all prior oral or written agreements covenants, representations and warranties (express or implied) concerning the subject matter of this AGREEMENT.

28.    **Authority.** The undersigned representatives for CSPA and TPR each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this AGREEMENT.

The CONSENTING PARTIES hereby enter into this AGREEMENT.

Date: _____, 2007          TRENCH PLATE RENTAL COMPANY

_____
By: Al Huggans
Title: Vice President

Date: _19 December_, 2007          CALIFORNIA SPORTFISHING
                                   PROTECTION ALLIANCE

_____
By: Bill Jennings
Title: Executive Director

APPROVED AS TO FORM:

1

2     Date: Dec 20        , 2007

3

4

5

6

7

8

9     Date: Dec. 20        , 2007

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

For DEFENDANT TRENCH PLATE
RENTAL

DONGELL LAWRENCE FINNEY LLP

By: Jason M. Booth, Esq.

For PLAINTIFF CALIFORNIA
SPORTFISHING PROTECTION
ALLIANCE

LAW OFFICES OF ANDREW L.
PACKARD

By: Andrew L. Packard Esq.
     Michael Lynes, Esq.

[PROPOSED] Consent Agreement          15          CASE NO. C-07-4130-CRB

# EXHIBIT A



Figure 2. Site Map
530 Garcia Avenue,
Pittsburg, California

| Potential Pollutant Sources | 001 | 002 | 003 |
|---|---|---|---|
| | | Outfall | |
| 1. Sediment Runoff | X | X | |
| 2. Material Storage Areas | X | X | |
| 3. On-site Truck Traffic | X | X | X |
| 4. Loading/Unloading Areas | | X | X |
| 5. Forklift Operations | | X | X |
| 6. Roof Drains | | X | X |
| 7. Welding Operations | | X | |
| 8. Employee Vehicle Traffic/Parking | | X | X |

FILE: SITEMAP0707.DWG    DATE: JULY 2007

Legend:
Storm Drain
Materials Storage Area
D/W Driveway

1" = 60'
0   15'   30'                60'

# EXHIBIT B



**California Sportfishing Protection Alliance**
*"An Advocate for Fisheries, Habitat and Water Quality"*
3536 Rainier Avenue, Stockton, CA 95204
Tel: 209-464-5067, Fax: 209-464-1028, E: deltakeep@aol.com

May 16, 2007

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Thomas A. Feldmar
President, CEO, and Agent for Service of Process
Trench Plate Rental Company
13217 Laureldale Avenue
Downey, CA 90242

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act**

Dear Sir:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Trench Plate Rental Company's facility located at 530 Garcia Avenue in Pittsburg, California ("the Facility"). The WDID identification number for the Facility is 2 07S015323. CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife and natural resources of the San Joaquin River, the Sacramento-San Joaquin Delta ("the Delta"), the San Francisco Bay and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of Trench Plate Rental Company (hereafter "Trench Plate Rental" or "you").

This letter addresses Trench Plate Rental's unlawful discharges of pollutants from the Facility to the City of Pittsburg's storm drain system, which discharges into the San Joaquin River and ultimately to the Delta. This letter addresses ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Industrial Storm Water Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Trench Plate Rental is hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Trench Plate Rental under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Industrial Storm Water Permit. These violations are described more fully below.

## I.    Background.

On or about July 1, 1999, Trench Plate Rental submitted its notice of intent to comply with the terms of the General Industrial Storm Water Permit. Based on CSPA's review of available documents, the Facility has reported to the Regional Board that it is classified under Standard Industrial Classification Code 7353 ("Heavy Equipment Rental").[1] The Facility consists of approximately 3.25 acres, approximately 50% of which are paved or otherwise impervious, and collects and discharges storm water to Pittsburg's storm drains. Pittsburg's storm drain system empties into the San Joaquin River and ultimately the Delta.

Outside and without cover, Trench Plate Rental receives, stores, and transports heavy steel plates, k-rails, aluminum shores and other specially manufactured metal products. CSPA is informed and believes that potential pollutants from the site include sediment, suspended solids, metals, and fuels, oils and other fluids associated with the operation and maintenance of heavy machinery and vehicles.

The San Francisco Bay Regional Water Quality Control Board (the "Regional Board" or "Board") has identified waters of the San Joaquin and the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous pesticides and mercury. *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf. The San Joaquin River is impaired for nickel.

The San Francisco Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for the San Francisco Bay, including the Oakland Estuary and the San Leandro Bay, in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://www.swrcb.ca.gov/rwqcb2/basinplan.htm. The Basin Plan includes a narrative toxicity standard stating that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms." *See* http://www.swrcb.ca.gov/rwqcb2/basinplan/web/BP_CH3.html. The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above

---

[1] CSPA is informed and believes that other SIC codes may also apply to activities at the Facility and that Trench Plate Rental is required to test its storm water for all potential pollutants as required by the General Industrial Storm Water Permit.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 3 of 10

8.5." *See id.* The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *See id.* The Basin Plan provides that "[w]aters shall not contain biostimulatory substances in concentrations that promote aquatic growths to the extent that such growths cause nuisance or adversely affect beneficial uses." *See id.*

EPA has established secondary MCL, consumer acceptance limits of 0.02 mg/L for aluminum and 1.0 mg/L for iron. *See* http://www.epa.gov/safewater/mcl.html#mcls. The California Department of Health Services has also established MCLs of 0.2-1.0 mg/L for aluminum and.0.3 mg/L for iron. *See* California Code of Regulations, title 22, §§ 64431, 64449. EPA has established numeric water quality standards for priority toxic pollutants (at a hardness of 100 mg/l), including: 0.009 mg/L for copper, 1.0 mg/L for iron, and 0.1 mg/L for zinc. *See* http://www.epa.gov/waterscience/criteria/wqcriteria. htm.

The General Industrial Storm Water Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Alliance Recycling: aluminum – 0.750 mg/L; copper – 0.0636 mg/L; pH – 6.0-9.0; iron – 1.0 mg/L; lead – 0.0816 mg/L; manganese – 1.0 mg/L; nickel – 1.417 mg/L; nitrate + nitrate ("N+N") = 0.68 mg/L; total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; and zinc – 0.117 mg/L. The State Water Quality Control Board also recently proposed adding a benchmark level for specific conductance of 200 μmho/cm.

## II.     Pollutant Discharges in Violation of the NPDES Permit.

Trench Plate Rental has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Industrial Storm Water Permit. Discharge Prohibition A(1) of the General Industrial Storm Water Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 4 of 10

exceedence of any applicable water quality standards contained in a Statewide Water
Quality Control Plan or the applicable Regional Board's Basin Plan.

### A.    *Discharges in Violation of the Permit.*

Trench Plate Rental has discharged and continues to discharge stormwater with
high levels of total suspended solids ("TSS"), specific conductivity and oil and grease
(measured as n-Hexane Extractable Material ("HEM")) in violation of the General
Industrial Storm Water Permit. These high pollutant levels have been documented during
significant rain events, including rain events indicated in the table of rain data attached
hereto as Exhibit A. Trench Plate Rental's Annual Reports and Sampling and Analysis
Results confirm discharges of specific pollutants and materials other than stormwater in
violation of the General Industrial Storm Water Permit provisions listed above. Self-
monitoring reports under the General Industrial Storm Water Permit are deemed
"conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*,
813 F.2d 1480, 1493 (9th Cir. 1988).

Trench Plate Rental has violated Discharge Prohibitions A(1) and A(2) and
Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit
by discharging storm water with unacceptable levels of TSS, specific conductivity, and
oil and grease on at least the following occasions:

| Date | Parameter | Concentration | EPA Benchmark |
|------|-----------|---------------|---------------|
| 3/20/06 | TSS | 4500 mg/L | 100 mg/L |
| 3/20/06 | Specific Conductivity | 270µmho/cm | 200 µmho/cm |
| 3/20/06 | HEM (Oil & Grease) | 18 mg/L | 15 mg/L |
| 12/22/05 | TSS | 17000 mg/L | 100 mg/L |
| 12/22/05 | Specific Conductivity | 400µmho/cm | 200µmho/cm |
| 12/22/05 | HEM (Oil & Grease) | 17 mg/L | 15 mg/L |
| 11/11/04 | TSS | 1200 mg/L | 100 mg/L |
| 2/15/05 | TSS | 580 mg/L | 100 mg/L |
| 2/15/05 | Specific Conductivity | 320µmho/cm | 200µmho/cm |
| 12/23/03 | TSS | 760 mg/L | 100 mg/L |
| 12/23/03 | Specific Conductivity | 290µmho/cm | 200µmho/cm |
| 4/24/03 | TSS | 280 mg/L | 100 mg/L |
| 4/24/03 | Specific Conductivity | 320µmho/cm | 200µmho/cm |
| 4/24/03 | HEM (Oil & Grease) | 46 mg/L | 15 mg/L |

Trench Plate Rental's Annual Reports confirm that Trench Plate Rental has
known that its stormwater contains the above-listed pollutants at levels exceeding EPA
Benchmarks and other water quality criteria since before May 16, 2002. CSPA alleges
that such violations also have occurred and will occur on other rain dates, including
during every significant rain event that has occurred since at least May 16, 2002, and that
will occur at the Facility subsequent to the date of this Notice of Violation and Intent to
File Suit. Exhibit A, attached hereto, sets forth specific rain dates on which CSPA

alleges that Trench Plate Rental has discharged storm water containing impermissible levels of TSS, specific conductivity, oil and grease and other pollutants in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit.

According to its Annual Reports filed with the Regional Board, Trench Plate Rental described storm water discharged from the Facility as "cloudy" on at least ten occasions since May 16, 2007. Yet, each time pollutants were observed, Trench Plate Rental checked the "No" box on the reporting form where it asks whether pollutants were observed in the storm water discharge. Moreover, despite observing visible pollutants in its storm water discharges, Trench Plate Rental failed to describe the source of the pollutants and to state which BMPs were implemented to prevent or reduce future discharges of the pollutants. Instead, Trench Plate Rental attested that it had fully implemented all necessary BMPs to achieve BAT/BCT at the Facility.

These unlawful discharges from the Facility are ongoing. Each discharge of stormwater containing pollutants at unacceptable levels from the Facility constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Trench Plate Rental is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since May 16, 2002.

**B.    Failure to Develop and Implement an Adequate Storm Water Monitoring Plan**

Section B(5)(a) of the General Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." (emphasis added) Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) requires that "samples shall be analyzed for . . . [t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

Trench Plate Rental has failed to analyze its storm water samples for all chemicals and pollutants that are "likely to be present in storm water discharges in significant quantities." See Section B(5)(c)(ii). CSPA is informed and believes that at least the following additional pollutants are "likely" to be present in Trench Plate Rental's storm water discharges in significant quantities: aluminum, copper, iron, lead, manganese, nickel and zinc. Trench Plate Rental's ongoing failure to analyze its storm water samples for these and other pollutants likely to be present in its storm water discharges constitutes ongoing violations of the Act.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 6 of 10

Section B(4) of the General Permit requires all dischargers to visually observe storm water discharges from their facilities at least once per month during the wet season (October 1 – May 160). Visual observations must document the presence of any "floating and suspended material, oil and grease, discolorations, turbidity, odor, and source of any pollutants." Records of observations must be maintained and the discharger must respond to reduce or prevent future discharges of pollutants. The discharger's SWPPP must also be modified accordingly.

Each of Trench Plate Rental's failures to comply with these mandatory monitoring requirements constitutes an ongoing violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Trench Plate Rental is subject to penalties for these violations of the General Industrial Storm Water Permit and the Act since May 16, 2002.

C.    *Failure to Implement BAT and BCT.*

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and non-conventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Industrial Storm Water Permit, Section A(8). CSPA's investigation indicates that Trench Plate Rental has not implemented BAT and BCT at the Facility for its discharges of total suspended solids, pH, specific conductivity, and other pollutants in violation of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

Trench Plate Rental was required to have implemented BAT and BCT by no later than October 1, 1992. Trench Plate Rental has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that Trench Plate Rental fails to implement BAT and BCT. Trench Plate Rental is subject to penalties for violations of the Order and the Act occurring since May 16, 2002.

D.    *Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan*

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP by no later than October 1, 1992 and to continuously update the SWPPP and its implementation to reflect BAT and BCT storm water controls. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Industrial Storm Water Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Industrial Storm Water Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby waterbodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Industrial Storm Water Permit, Section A(4)); a list of significant materials handled and stored at the site (General Industrial Storm Water Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Industrial Storm Water Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Industrial Storm Water Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Industrial Storm Water Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedence of water quality standards.

CSPA's investigation of the conditions at the Facility demonstrates that Trench Plate Rental has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Trench Plate Rental has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Trench Plate Rental has been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that Trench Plate Rental fails to develop and implement an effective SWPPP. Trench Plate Rental is subject to penalties for violations of the Order and the Act occurring since May 16, 2002.

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 8 of 10

E.    **Failure to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Trench Plate Rental discharges storm water containing unacceptable levels of total suspended solids, specific conductivity and oil and grease that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutants, Trench Plate Rental was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Trench Plate Rental was aware of high levels of many these pollutants prior to May 16, 2002. Yet, Trench Plate Rental has never filed a timely report describing its non-compliance with the General Industrial Storm Water Permit in violation of Section C(11)(d).

Trench Plate Rental has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since at least May 16, 2002, and will continue to be in violation every day that Trench Plate Rental fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Trench Plate Rental is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since May 16, 2002.

F.    **Failure to File Timely, True and Correct Annual Reports.**

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Industrial Storm Water Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the

CSPA Notice of Violation and Intent To File Suit
May 16, 2007
Page 9 of 10

discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Industrial Storm Water Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Trench Plate Rental has signed and submitted incomplete Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance at the Facility. Trench Plate has consistently submitted its Annual Reports late (approximately August 11th in 2006, August 18 in 2005, and August 4th in 2004). In 2003, Trench Plate Rental submitted its 2002-2003 Annual Report on May 19, 2003 despite that the Wet Season does not end until May 161st; moreover, Trench Plate Rental failed to conduct a visual observation of storm water discharge during May 2003, claiming that there was "no rain."

Consequently, Trench Plate Rental has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Trench Plate Rental submitted an incomplete or incorrect annual report that falsely certified compliance with the Act. These violations are continuous and ongoing until Trench Plate Rental submits a complete and correct Annual Report for each year that Trench Plate Rental has been subject to the General Permit. Trench Plate Rental is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since May 16, 2002.

## III.    Persons Responsible for the Violations.

CSPA puts Trench Plate Rental Company on notice that it is the person responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Trench Plate Rental on notice that it intends to include those persons in this action.

## IV.    Name and Address of Noticing Party.

Our name, address and telephone number is as follows: Bill Jennings, Executive Director, California Sportfishing Protection Alliance, 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

## V.    Counsel.

CSPA has retained legal counsel to represent it in this matter. Please direct all communications to:

Andrew L. Packard
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
(707) 763-7227
andrew@packardlawoffices.com

Michael R. Lozeau
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, California 94501
(510) 749-9102
mrlozeau@lozeaulaw.com

## VI.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Trench Plate Rental to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit. In addition to civil penalties, CSPA will seek declaratory relief and injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the Act against Trench Plate Rental and its agents for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Tom Howard, Acting Executive Director
State Water Resources Control Board
1001 "I" Street
Sacramento, CA 95814

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

ATTACHMENT A

Significant Rain Events*, Trench Plate Rental (Pittsburg, CA)
May 16, 2002 – May 16, 2007

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| November | 07 | 2002 | February | 24 | 2004 | November | 28 | 2005 |
| December | 09 | 2002 | February | 25 | 2004 | November | 30 | 2005 |
| December | 14 | 2002 | February | 26 | 2004 | December | 17 | 2005 |
| December | 16 | 2002 | March | 01 | 2004 | December | 18 | 2005 |
| December | 20 | 2002 | May | 28 | 2004 | December | 20 | 2005 |
| December | 21 | 2002 | October | 19 | 2004 | December | 21 | 2005 |
| December | 27 | 2002 | October | 23 | 2004 | December | 22 | 2005 |
| December | 30 | 2002 | October | 24 | 2004 | December | 25 | 2005 |
| January | 09 | 2003 | November | 03 | 2004 | December | 27 | 2005 |
| January | 10 | 2003 | November | 09 | 2004 | December | 28 | 2005 |
| January | 21 | 2003 | November | 10 | 2004 | December | 30 | 2005 |
| March | 14 | 2003 | November | 11 | 2004 | December | 31 | 2005 |
| March | 16 | 2003 | December | 06 | 2004 | January | 01 | 2006 |
| March | 22 | 2003 | December | 07 | 2004 | January | 02 | 2006 |
| April | 03 | 2003 | December | 08 | 2004 | January | 18 | 2006 |
| April | 12 | 2003 | December | 27 | 2004 | January | 30 | 2006 |
| May | 02 | 2003 | December | 28 | 2004 | February | 17 | 2006 |
| May | 03 | 2003 | December | 29 | 2004 | February | 26 | 2006 |
| August | 21 | 2003 | December | 30 | 2004 | February | 27 | 2006 |
| November | 06 | 2003 | December | 31 | 2004 | March | 02 | 2006 |
| November | 08 | 2003 | January | 01 | 2005 | March | 03 | 2006 |
| November | 15 | 2003 | January | 02 | 2005 | March | 06 | 2006 |
| November | 30 | 2003 | January | 06 | 2005 | March | 11 | 2006 |
| December | 01 | 2003 | January | 07 | 2005 | March | 13 | 2006 |
| December | 04 | 2003 | January | 08 | 2005 | March | 17 | 2006 |
| December | 06 | 2003 | January | 10 | 2005 | March | 18 | 2006 |
| December | 09 | 2003 | January | 11 | 2005 | March | 21 | 2006 |
| December | 10 | 2003 | January | 25 | 2005 | March | 25 | 2006 |
| December | 13 | 2003 | January | 27 | 2005 | March | 28 | 2006 |
| December | 19 | 2003 | February | 14 | 2005 | March | 29 | 2006 |
| December | 22 | 2003 | February | 15 | 2005 | April | 03 | 2006 |
| December | 23 | 2003 | February | 17 | 2005 | April | 04 | 2006 |
| December | 24 | 2003 | February | 19 | 2005 | April | 05 | 2006 |
| December | 26 | 2003 | February | 20 | 2005 | April | 11 | 2006 |
| December | 28 | 2003 | February | 26 | 2005 | April | 12 | 2006 |
| December | 29 | 2003 | February | 27 | 2005 | April | 13 | 2006 |
| January | 01 | 2004 | March | 01 | 2005 | April | 17 | 2006 |
| January | 02 | 2004 | March | 03 | 2005 | May | 21 | 2006 |
| January | 06 | 2004 | March | 18 | 2005 | November | 01 | 2006 |
| January | 23 | 2004 | March | 19 | 2005 | November | 03 | 2006 |
| February | 02 | 2004 | March | 21 | 2005 | November | 10 | 2006 |
| February | 03 | 2004 | March | 22 | 2005 | December | 14 | 2006 |
| February | 15 | 2004 | March | 27 | 2005 | December | 21 | 2006 |
| February | 16 | 2004 | April | 08 | 2005 | January | 28 | 2007 |
| February | 17 | 2004 | April | 27 | 2005 | February | 08 | 2007 |
| February | 18 | 2004 | May | 07 | 2005 | February | 09 | 2007 |
| February | 21 | 2004 | May | 08 | 2005 | February | 10 | 2007 |

*Rain data gathered from three independent weather monitoring stations near the Facility. Precipitation given in inches.

## ATTACHMENT A

Significant Rain Events*, Trench Plate Rental (Pittsburg, CA)
May 16, 2002 – May 16, 2007

| February | 12 | 2007 | February | 26 | 2007 | April | 21 | 2007 |
| February | 22 | 2007 | February | 27 | 2007 | April | 22 | 2007 |
| February | 25 | 2007 | April | 14 | 2007 | | | |

*Rain data gathered from three independent weather monitoring stations near the Facility. Precipitation given in inches.